UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAMION NEVILLS, JR.,

                Plaintiff,           Civil Action No. 18-cv-12200
                                          Honorable Arthur J. Tarnow
v.                                        Magistrate Judge David R. Grand

JONATHAN HILDRETH,

                Defendant.
_____/

## REPORT AND RECOMMENDATION TO DENY DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT [31]

This is a prisoner civil rights case brought by *pro se* plaintiff Damion Nevills ("Nevills") against Jonathan Hildreth ("Hildreth"), a corrections officer in the Michigan Department of Corrections ("MDOC"). Nevills alleges that on February 13, 2018, Hildreth called him a derogatory term, and then, after Nevills complained, forcefully handcuffed him, causing him extreme pain. (ECF No. 1, PageID.3.)

An Order of Reference was entered on August 1, 2018, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. § 636(b). (ECF No. 6.) On March 1, 2019, Hildreth filed a motion for summary judgment, arguing that Nevills failed to satisfy the requirements of an Eighth Amendment claim, and that Eleventh Amendment immunity barred Nevills' complaint because Hildreth "acted reasonably without violating Nevills' clearly established constitutional rights." (ECF No. 12.) The Court granted this motion in part and denied it in part without prejudice, giving Hildreth the opportunity to file a renewed motion for summary judgment because, quite oddly, while he had referenced certain potentially dispositive evidence, he failed to provide it. (ECF Nos. 28, 33.)

1

Hildreth filed his renewed motion for summary judgment on February 6, 2020. (ECF No. 31.) Nevills responded and Hildreth replied. (ECF Nos. 37,41.) Generally, the Court will not hold a hearing on a motion in a civil case in which a party is in custody, and the Court declines to hold one here. *See* E.D. Mich. L.R. 7.1(f).

### A.     Background

Nevills is a prisoner currently confined at the MDOC's Gus Harrison Correctional Facility ("ARF)" in Adrian, Michigan. (ECF No. 1, PageID.1.) He brings a civil rights action under 42 U.S.C. § 1983 against Hildreth, a corrections officer at Macomb Correctional Facility ("MRF") regarding an incident that occurred when Nevills was housed there. (*Id.*; ECF No. 12, PageID.41.)

Nevills alleges that on February 13, 2018, while he was in line to receive his medication, Hildreth "physically brutally assaulted" him. (ECF. No 1, PageID.3.) Nevills asserts that Hildreth became threatening towards him calling him a "cho"[1] and saying "you raped her" and "I'm going to kill you. You're going on A-wing." (*Id.*) Nevills contends that he "tried to laugh him off as not to expose other inmates that I was locked up for a sex offense, but ultimately I responded by telling [Hildreth] that he could not talk to me like that, and that I would file a grievance." (ECF No. 33, PageID.285.) Nevills contends that Hildreth then "became upset as he proceeded in my direction and said, 'I'm going to kill you.'" (*Id.*) Nevills contends that Hildreth approached him, "forcefully" grabbed him, and then proceeded to handcuff him. (*Id.*) Nevills alleges that during this encounter, Hildreth "twisted [his] arm in such a fashion that it felt like he was trying to break it and [he] felt intense pressure and pain in [his] arm and wrist." (*Id.*, PageID.286.) Nevills avers that he did not violate any order given to him by Hildreth that would have led Hildreth to need to use force against him. (*Id.*)

---

[1] Nevills contends that "cho" means "child molester." (ECF No. 26, PageID.142.)

Nevills put a kite in to seek medical care, and about two days later was seen by a nurse. (ECF No. 31-2, PageID.248.)  He complained of "problems with his arm" and said he was "in a lot of pain still."  (*Id.*)  Nevills admits the pain resolved within a few weeks.  (ECF No. 37, PageID.286.)

Hildreth admits that a confrontation took place, however his version of the events differs from Nevills'.  Hildreth claims that the medicine line area was noisy, and he commented that it sounded like "Chewy [*i.e.*, Chewbacca the Wookiee from the *Star Wars* saga] [was] in the unit." (ECF No. 31-3, PageID.256.)  Hildreth denies directing the comment toward Nevills, or any other particular prisoner.  (*Id.*)  Hildreth contends that Nevills then began swearing at him and "riling up" another inmate who was present.  (*Id.*)  Hildreth claims that he then ordered Nevills to go to the front of the line to get his medication, and that when Nevills refused to do so, Hildreth ordered Nevills to return to his cell and told him his medications would be brought to him.  (*Id.*)  When Nevills refused, Hildreth moved toward Nevills to handcuff him, but Nevills pulled away.  (*Id.*)  Hildreth contends that he then "placed" Nevills against the wall and, with Officer Andrew Shannon's assistance, handcuffed Nevills and escorted him from the unit to the "A-wing shower." (*Id.*)

It appears that Hildreth wanted Nevills to be disciplined for disobeying a direct order. However, Sergeant Darnell Mandy, who was present during the incident, saw that aspect of the confrontation differently.  According to an April 7, 2018 investigation report prepared by Manager of Internal Affairs John Purdom (the "Investigation Report"), Sergeant Mandy explained that when Hildreth asserted that Nevills would be "staying on A-Wing for a DDO [disobeying a direct order]," Mandy responded, "No, he is not."  (*Id.*, PageID.256.)  "Sergeant Mandy said that initially Officer Hildreth told him that he was going to write a Threatening Behavior Misconduct on

3

prisoner Nevills. Sergeant Mandy stated that he told Officer Hildreth that he didn't see how a Threatening Behavior Ticket could be written because at no time did he see prisoner Nevills making any attempt to be 'threatening'." (*Id.*, PageID.257.) Sergeant Mandy then told Hildreth that "he had to have more patience because Housing Unit 7 prisoners are not typical prisoners and you have to communicate with them more." (*Id.*, PageID.256-57.)

While Sergeant Mandy disputed the appropriateness of the charge Hildreth wished to file against Nevills, Mandy stated that "Nevills gave no indication of being hurt or in pain and also refused to see Healthcare." (*Id.*)

Nevills filed a grievance against Hildreth regarding this incident. (*See* ECF No. 1, PageID.6–11.) He exhausted the MDOC's three-step grievance process, with the MDOC denying the grievance at each step. (See *id.*; ECF No. 12, PageID.42.) Nevills then sued Hildreth in his official and individual capacities for damages, claiming that Hildreth violated his rights under the Eighth Amendment. (*Id*. at PageID.1, 3.)

In his original motion for summary judgment, Hildreth stated that an investigation into Nevills' allegations took place, including a review of camera footage of the incident. (*Id*. at PageID.42.) However, Hildreth did not attach the Investigation Report to his motion, and did not supply any video evidence to the Court. (ECF No. 12.) Accordingly, the Court explained that, with the exception of Nevills' claims of verbal abuse, it was "unable to conclude that Hildreth [was] entitled to summary judgment." (ECF No. 28, PageID.167.) In addition, the Court held: "before the Court is called upon to assess the ultimate issue in this case – whether the force used by Hildreth was excessive – it should at least be advised, through proper evidence, as to whether Nevills actually received treatment, and, if so, what the relevant medical records reflect." (*See id*. at PageID.168.)

4

Because of these evidentiary shortcomings, the Court explained:

> [I]t would be inappropriate to grant Hildreth's instant motion on the present record. However, because these issues may ultimately weigh in favor of granting summary judgment in Hildreth's favor, his instant motion should be denied without prejudice, and he should be given 45 days to file a renewed summary judgment motion supported by appropriate evidence.

(*See id.* at PageID.169.)

On February 6, 2020, Hildreth filed his renewed summary judgment motion, as well as medical records, a copy of the Investigation Report, and a video of the incident in question. (ECF No. 31.)

### B.  Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009)(internal quotations omitted).

At the summary judgment stage, the ultimate question is "'whether the evidence presents

a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). Put another way, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

**C.     Analysis**

"Although prison officials may be required to use force to ensure prison security, they may violate the Eighth Amendment's proscription against cruel and unusual punishment if the force used amounts to an 'unnecessary and wanton infliction of pain.' []  The core judicial inquiry when a prison official stands accused of using excessive force in violation of the Eighth Amendment is whether the force was applied in a good-faith effort to maintain or restore order, or maliciously and sadistically to cause harm." *Manley v. Hughes*, No. 4:18-CV-1431, 2018 WL 4539355, at *2 (N.D. Ohio Sept. 21, 2018) (internal citations omitted.)

As the Supreme Court explained in *Hudson v. McMillian*, 503 U.S. 1 (1992):

> What is necessary to establish an "unnecessary and wanton infliction of pain," we said, varies according to the nature of the alleged constitutional violation. []  For example, the appropriate inquiry when an inmate alleges that prison officials failed to attend to serious medical needs is whether the officials exhibited "deliberate indifference." []  This standard is appropriate because the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns. []
> By contrast, officials confronted with a prison disturbance must balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force. Despite the weight

6

of these competing concerns, corrections officials must make their decisions "in haste, under pressure, and frequently without the luxury of a second chance." [] We accordingly concluded in *Whitley* [*v. Albers*, 475 U.S. 312 (1986)] that application of the deliberate indifference standard is inappropriate when authorities use force to put down a prison disturbance. Instead, ***"the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'"*** []

Many of the concerns underlying our holding in *Whitley* arise whenever guards use force to keep order. Whether the prison disturbance is a riot or a lesser disruption, corrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmates. Both situations may require prison officials to act quickly and decisively. Likewise, both implicate the principle that "'[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" [] In recognition of these similarities, ***we hold that whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in Whitley: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.***

\* \* \*

Under the *Whitley* approach, the extent of injury suffered by an inmate is one factor that may suggest "whether the use of force could plausibly have been thought necessary" in a particular situation, "or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." [] ***In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the responsible officials," and "any efforts made to temper the severity of a forceful response."*** [] The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Hudson*, 503 U.S. at 5–7 (emphasis added) (internal citations omitted).

With these standards in mind, the Court finds a number of factual questions exist as to the "core" inquiry in this case – whether Hildreth applied force "in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."

7

First, questions exist about the need for force. Whereas Hildreth claims he decided to handcuff Nevills because Nevills failed to follow Hildreth's orders, Sergeant Mandy's statements contradict that claim. When Hildreth asserted that Nevills would be "staying on A-Wing for a DDO [disobeying a direct order]," Sergeant Mandy responded, "No, he is not." (ECF No. 31-3, PageID.256.) Similarly, when Hildreth indicated that he was going to write Nevills a Threatening Behavior Misconduct, Sergeant Mandy "told Officer Hildreth that he didn't see how a Threatening Behavior Ticket could be written because at no time did he see prisoner Nevills making any attempt to be 'threatening'." (*Id.*, PageID.257; *see also id.*, PageID.253 (noting that "Sergeant Mandy explained to Officer Hildreth that he could not charge prisoner Nevills with Threatening Behavior because at no time did Nevills threaten him.")) Nevills denies refusing to follow any command by Hildreth. (ECF No. 37, PageID.286.) Additionally, while Hildreth contends that one reason he decided to handcuff Nevills was that Nevills was "riling up" other inmates, the video evidence suggests there is at least a question of fact about that issue. Indeed, from the Court's review of the video, the few inmates who were present when Hildreth moved towards Nevills to handcuff him appear to be standing still and undisturbed by Nevills. A reasonable jury could conclude from all of this evidence that Hildreth's proffered reason for handcuffing Nevills was pretext.

Similarly, Sergeant Mandy's statements (and the Court's review of the video) raise questions about whether Hildreth reasonably perceived a threat that warranted the use of force.

Questions also exist as to efforts Hildreth made to temper the need for force. The Investigation Report refers to a February 21, 2018 e-mail Mandy sent to Captain Herbert about the incident. Although the e-mail itself is not part of the record, the Investigation Report indicates that in the e-mail, Mandy "states that he heard Officer Hildreth call prisoner Nevills 'Chewbacca,' which upset Nevills, then exchange more words with Nevills prior to Officer Hildreth placing him

8

against the wall and restraining him . . ." (*Id.*, PageID.259.)[2] Mandy also told Hildreth "he had to have more patience" when dealing with inmates in the particular unit. (*Id.*, PageID.256-57.) A review of the video suggests that when Hildreth approached Nevills, Nevills was simply standing in line to receive his medication. And, the video unfortunately has no audio, so while Nevills and Hildreth do appear to exchange words, it is impossible to tell what each party said.

Finally, questions exist as to the relationship between the need for force and the amount of force used. Even assuming it was appropriate for Hildreth to place Nevills in handcuffs, the positioning of the video camera makes it impossible to say that it "blatantly contradicts"[3] Nevills' claim that Hildreth applied pressure to his wrist and arm during the handcuffing process in a manner that caused Nevills extreme pain. To be sure, the handcuffing itself appears routine and non-violent, and Hildreth does not apply any jerking or straining motions that might typically be associated with more forceful handcuffing. However, because the camera is positioned behind Hildreth, and Hildreth is directly behind Nevills, it is impossible to see the position of Nevills' arms behind his back during the handcuffing. The Court notes, however, that in his Investigation Report, Purdom does indicate that Hildreth had Nevills in a "wrist lock" as he escorted Nevills from the room. (ECF No. 31-3, PageID.253.)

---

[2] Mandy apparently later softened his stance about what led to the confrontation, saying that "he heard prisoner Nevills respond to some kind of comment made by Officer Hildreth about 'Chewbacca' . . . Sergeant Mandy said he did not know if Officer Hildreth was calling prisoner Nevills 'Chewbacca' or not." (*Id.*, PageId.257.) However, this simply creates a question about which version of his statements Mandy now stands by.

[3] *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that a court, when determining whether there is a genuine dispute of material fact in a case, may ignore testimonial evidence when it is "blatantly contradicted" by video evidence).

Thus, while the video does not appear to show a violent or overly-physical handcuffing, particularly given the questions about the need for force in the first place, there remains a question about whether the handcuffing constituted "excessive force."

For all of these reasons, even taking into consideration the deference owed to prison guards who face the challenging task of having to make quick decisions to maintain discipline and order in a potentially volatile setting, *Whitley*, 475 U.S. at 321–22, Nevills raised questions of fact that preclude the Court from granting Hildreth's summary judgment motion.

The same questions identified above defeat Hildreth's claim that he is entitled to qualified immunity. Qualified immunity shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known. *Adams v. Blount Cty., Tenn.*, 946 F.3d 940, 947 (6th Cir. 2020). In determining whether an officer is shielded from civil liability by qualified immunity, the Court must determine: (1) whether, when viewing the facts in the light most favorable to Nevills, Hildreth violated his constitutional rights; and (2) whether those rights were clearly established at the time of the alleged violation. *Id.* at 948.

Here, viewed in the light most favorable to Nevills, Hildreth handcuffed him not because he violated an order or because he was "riling up" other inmates, but because Nevills challenged the comment he perceived Hildreth to have made. A reasonable jury could also conclude that the handcuffing was unnecessary and constituted excessive force. Nevills' right to be free from such excessive force was clearly established at the time of the incident, and Hildreth does not contend otherwise. (ECF No. 31, PageID.242-43.) Thus, Hildreth is not entitled to qualified immunity.

### D. Conclusion

For the foregoing reasons, the Court **RECOMMENDS** that Hildreth's Renewed Motion

for Summary Judgement **(ECF No. 31)** be **DENIED**.

Dated: July 7, 2020                                s/David R. Grand
Ann Arbor, Michigan                        DAVID R. GRAND
                                                                                         United States Magistrate Judge

## **NOTICE TO THE PARTIES REGARDING OBJECTIONS**

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 7, 2020.

s/Eddrey O. Butts<br>
EDDREY O. BUTTS